Bart A. HULBERT, Sr., Applicant–Appellant,

v.

STATE of Iowa, Respondent–Appellee.

No. 94–0331.

Court of Appeals of Iowa.

Jan. 23, 1995.

Gaylen V. Hassman of Engelbrecht, Ackerman & Hassman, Waverly, for appellant.

Bonnie J. Campbell, Atty. Gen., Julie H. Brown, Asst. Atty. Gen., and Lawrence A. Stumme, County Atty., for appellee.

Considered by HAYDEN, P.J., and SACKETT and HUITINK, JJ.

SACKETT, Judge.

Bart A. Hulbert, Sr., appeals from the trial court's denial of his application for postconviction relief. Hulbert was found guilty, following a jury trial, of sexual abuse in the second degree and guilty of lascivious acts with a child and of indecent contact with a child. Hulbert appealed his conviction. This court, in an unpublished opinion, reversed the convictions and remanded for a new trial finding the trial court abused its discretion in not allowing certain opinion testimony of Ralph Charles Underwager. The supreme court took the case for further review and, in *State v. Hulbert,* 481 N.W.2d 329 (Iowa 1992), vacated our decision and affirmed the trial court on the evidence issue but remanded for resentencing. Hulbert now contends his attorney on his original appeal failed to give him effective legal representation. We affirm.

In May 1989, Hulbert's ten-year-old daughter N. told Debra Riehle, her school counselor, her father had sexually abused her. The counselor had recently presented a program to N.'s class on good, bad and confusing touches and had met with N. because Hulbert and the child's mother were in the process of a dissolution of marriage action. After making the revelations to the school counselor, N. was then interviewed by Eliza-

beth Branstad, a child abuse investigator with the department of human services. The interview with Branstad was recorded on audio tape. On June 2, 1989, N. was interviewed again by Branstad. On June 7, 1989, she was again interviewed by a third person, Kathryn Lee, a social worker at the Child Protection Center in Cedar Rapids. The interview with Lee was recorded on videotape.

Riehle, Branstad, and Lee were among those who testified as the state's witnesses at trial, as did Hulbert's estranged wife. Among Hulbert's witnesses was Ralph Underwager, a psychologist, who testified as an expert witness hired by Hulbert. The focal and only real issue at trial was whether N. was telling the truth.

Hulbert raises a number of issues on appeal, all of which are premised on the alleged ineffective representation of his appellate counsel. Hulbert was represented in his trial and the postconviction relief proceedings by the same attorney who also represents him on this appeal. He was represented in the original appeal from the conviction by a different attorney.

 Because Hulbert asserts a violation of his constitutional right to effective assistance of appellate counsel, we basically review the record de novo. *See Hinkle v. State,* 290 N.W.2d 28, 30 (Iowa 1980). To succeed, Hulbert must prove by a preponderance of the evidence that his appellate attorney did not perform an essential duty and as a result of this failure, he was prejudiced. *See State v. Risdal,* 404 N.W.2d 130, 131 (Iowa 1987). In looking at the representation given Hulbert by his appellate attorney, we presume the attorney competently represented him. *See id.*

 Hulbert first contends he should have had the opportunity to have Underwager testify that after viewing the videotape of the Lee interview, he was of the opinion Lee's interview was conducted in such a manner that it was suggestive. Hulbert recognizes his appellate counsel did raise the issue in the original appeal, but contends he was prejudiced because appellate counsel misstated the record, failed to take advantage of the

offer of assistance by his trial attorney, and failed to advance certain arguments that would have resulted in reversal of his conviction.

To understand his argument, we need review the record as made. Prior to trial, Hulbert filed a motion in limine asking the trial court to preclude Riehle, Branstad, and Lee from testifying for the State to statements N. made to them, their observations of her, and their conclusions about her actions and statements and their opinions as to her truthfulness. This motion was overruled. The State filed a motion in limine seeking to preclude Hulbert from calling Underwager as a witness. The trial court also overruled this motion.

Before Underwager testified, the State asked the court to clarify its prior ruling concerning his testimony. Specifically, the State argued Underwager should not be allowed to testify to things not in evidence, including the videotape. Hulbert contended the videotape did not have to be in evidence for Underwager to critique the interview it showed but, if the fact the videotape was not admitted into evidence was the only thing standing in the way of admitting Underwager's testimony criticizing the interviewing techniques, he would call a witness and introduce the videotape in evidence. The court ruled Hulbert could not introduce the videotape, and Underwager could not testify with reference to the videotape or the Lee interview. The trial court based the ruling on the belief it had sustained Hulbert's motion in limine to keep the videotape out of evidence. Hulbert told the trial court no motion in limine had been granted excluding the videotape from being introduced in evidence. The trial court did not change its ruling on this issue. There is no record of a ruling by the trial judge sustaining Hulbert's motion in limine excluding the videotape from being admitted in evidence. The brief of Hulbert's first appellate counsel represented the videotape had been excluded from evidence on the basis of Hulbert's motion in limine. The supreme court, in finding against Hulbert on this issue, said, in part: "While this opinion evidence may well have been strengthened by a demonstration of Lee's performance,

Hulbert himself moved to exclude the demonstration tool. Under the circumstances, we cannot say the court abused its discretion by restricting its use. No ground for reversal appears." *Hulbert,* 481 N.W.2d at 334.

The fact Hulbert's motion in limine to exclude the videotape of Lee's interview had not been sustained was called to appellate counsel's attention by Hulbert's trial attorney, in a letter of March 26, 1990. In the letter, trial counsel also agreed to assist appellate counsel in any way. At the postconviction hearing, Hulbert's trial attorney, again his attorney for purposes of the postconviction relief proceedings, made a professional statement that appellate counsel never contacted him. Hulbert testified at the postconviction hearing he told or wrote his appellate counsel several times about the mistake after receiving our prior decision and prior to further review by the supreme court but she "brushed him off." The trial court in the postconviction proceedings found Hulbert's statements not credible on this issue.

While the videotape was not introduced in the original proceeding, the State called Lee to testify. When called as a witness, Lee testified the interviewing protocol she uses was designed by various professional groups and developed to obtain as accurate an assessment as possible from the children; the philosophy is, to get an accurate assessment of a child, the comfort level need be raised and the interviewer needs to avoid suggestive questioning; this can be partly accomplished by sitting at the same level as the child or having the same eye level as the child, to have the interviewer's body convey a message of being supportive; for the interviewer to be open to whatever the child might talk about and not have strong reactions to what they say but to be supportive of what they say. Lee testified during the interview N. spoke softly, was difficult to understand, appeared embarrassed and nervous, and she brought out dolls during the interview because N. was having a difficult time relating the events. Our review of the videotape of this interview demonstrates Lee used most of the interview techniques she testified she used, however, she did tend to phrase her questions in a manner that assumed something had happened to N. A review of the videotape further demonstrates N. was nearly impossible to understand, receptive to suggestions, made no eye contact, and her body was in nearly constant motion.

Underwager is a licensed consulting psychologist and director of the Institute for Psychological Therapies based in Northfield, Minnesota. He was allowed to testify as to the harm of the "good touch, bad touch, confusing touch" program and the use of anatomically correct dolls and diagrams in interviews.

Through an offer of proof,[1] defense counsel showed Underwager testified he had seen

---

1. The offer of proof included the following testimony:

A. The interview techniques used by Ms. Kathy Lee I regard as very suggestive, very leading and coercive. It begins with Ms. Lee saying to the child that "In this room the rule is, and so on, you tell the truth." And I regard that as a communication essentially of a threat or a demand. It's a highly demanding statement that the child must produce what she has produced before and that the insistence that, "In this room the rule is you tell the truth," is a message to the child, "Tell me, Ms. Lee, what it is that I expect to hear," because the first thing she does is to signify that, "In this room I talk to children who are in trouble, children who have been hurt and so on."

Subsequent to that initial and I think highly crucial behavior on the part of the adult toward the child, throughout the course of the interview the adult provides leading and suggestive questions, provides positive reinforcement, if the child says things that the adult approves, accepts.

If the child does not say what is expected, as for example, early on in response to the first question about, "Tell me what your dad did," although it isn't clear, I listened to it time and time again, and it is clear the last thing the child says is, "I don't know."

At that point Miss Lee does not respond to that statement by the child but continues to ask the same question, coming back at it in a variety of ways, which again constitutes a message to the child, "Your last answer, the answer that you gave me, is not the one I want. It is not the one that is acceptable. Give me the one that I want."

The interrogator does not attend to what I think is again a very powerful data, and that is the use by the child of the language game of the sexual abuse group. There are different language games. The words acquire different meaning, depending upon the language game that we are in. When the child says, "touched in places where I shouldn't be touched unless I'm sick or hurt," and everybody knows that the child is referring to genitalia and what he be-

the videotape of N.'s interview with Lee and he was prepared to critique the interview techniques used by Lee in the interview. In the offer of proof, Underwager critiqued the techniques employed by Lee in interviewing N. as suggestive and leading. Underwager said Lee does not follow through throughout the course of the interview on any potential alternative but continues to seek the responses which will affirm the hypothesis she began with, that is, N. had been sexually abused by her father. Underwager's critique of Lee's interviewing techniques was not heard by the jury.

Hulbert contends the trial court abused its discretion in not allowing Underwager's testimony, especially where Lee's testimony sought to create the impression her interviewing technique was supportive, not suggestive or coercive, and, while the trial court allowed Lee to testify to the interview with N., it did not treat Hulbert's expert in the same way. Hulbert contends his appellate counsel would have been successful with the supreme court if the issue had been correctly presented, specifically, if the supreme court had been told the trial court allowed the State's witnesses to testify to the truthfulness and veracity of N.

Hulbert must now show, but for his appellate counsel's errors in (1) not correctly presenting the record, (2) not consulting with his trial attorney, and (3) not advancing the proper argument, the supreme court would have ruled differently on the issue of his presenting Underwager's criticisms of the techniques employed by Lee in interviewing N. as he observed from the videotape.

We have concern with appellate counsel's failure to communicate with trial counsel, particularly here, where trial counsel specifically wrote appellate counsel and noted he had several issues he felt would be successful on appeal and he stood ready to visit with her about them. A trial attorney has a particular knowledge about what happened at trial that is not easy to ascertain from the written record. This was particularly evident here where the statement of the trial record made by the appellate attorney appears to have been in error. However; the failure to communicate, standing alone, does not mean appellate counsel was not effective and here, even though appellate counsel may have made a mistake in summarizing the trial record that trial counsel would have recognized if consulted does not necessarily entitle Hulbert to the relief he seeks.

Hulbert must still show, but for the errors, the challenged videotape and testimony would have been admitted and, when admitted, the result would have been different.

During trial, the court ruled Underwager could testify about the "good touch, bad touch, confusing touch" program,[2] the effect of successive interviews in a short time peri-

lieves or accepts, that's a clear, persuasive indication the child has been exposed to such prior learning to have learned that language game and then to be receiving in that kind of language what she has learned from other prior learning experiences.

The interrogator doesn't attend to that at all and in fact does not follow through throughout the course of the interview on any potential alternative but continues to seek the responses which will affirm the hypothesis the interviewer began with, that the child has been sexually abused by her father.

Q. And then, Doctor, in light of the videotape technique to which you have testified, what is the consequence of such a technique as you observed? A. The consequence may well be to first teach a child an account, shape it, mold it, and that simple reinforcement theory. And then secondly, in that child to produce a subjective sense of reality. And third, it affirms the bias and the prejudice of the adult interrogator. And finally, the consequence of the suggestion inherent in that must be—I mean those behaviors

must be considered when this child's statements are weighed and assessed.

2. Underwager testified:
Q. Would you tell us then, Doctor, what your studies and your research has shown about the effectiveness of these programs [good touch, bad touch, confusing touch] generally? A. They are not effective. They do not prevent sex abuse. They do not result in any increase in the ability to children to either detect or respond appropriately.

They do generate, ... the hazard study, 35 percent casualty rate; that is, children who become very anxious, depressed and fearful. The confusion generated by these programs is caused by the reality that children to whom they are presented do not have the abstract capacity. They do not have the ability to think absolutely enough and to make the fine discrimination required. So the effect has been shown to be quite confusing.

The Kolko study in '87 found that of their program groups, two experimental groups, one control group, with the 40 children in the experimental groups, in the month following the pre-

od,[3] and the use of "anatomically correct" dolls[4] and diagrams[5] in interviews if he re-

sentation of the program, 20 of them, 20 of the experimental people made reports alleging abuse. None of the control group did. And the researchers didn't report those results as they are mandated to do so to the authorities. They just didn't do it.

The most recent study of the University of California in Los Angeles Family Life Research Center, which is a major center and looked at—it is either 15 or 18 of these programs in California—concluded that they should not be presented any longer because of the very high risk for negative impact upon the children.

. . . .

Q. What then is suggested to a child who hears such a program [good touch, bad touch, confusing touch]? A. The effect of presentation of these programs is to suggest to children that behaviors which they may have thought were essentially innocuous or pleasant or affectionate, may be within the realm of confusing touch or bad touch. And that's the principal effect. It confuses the children about what is proper and acceptable behavior, and they may well then misinterpret, misunderstand normal behavior.

Q. And when you talk about suggestion, Doctor, what are you talking about? What do you mean by suggestion? Could you be a bit more specific? A. The presentation of the concept good touch and bad touch suggest that basically there are only those two poles; and the rich, complex human network of touching and how we touch each other, what that means to us, is both ignored and reduced to just these two poles.

The research evidence is that before the presentation of such a program on touch 16 percent of the children thought all touch was bad. After the presentation of the program 45 percent thought or said all touching is bad. So it tends to communicate to children that touch per se is just bad.

3. Underwager testified:

Q. Doctor, have you also undertaken any special studies, testing or research about the impact of successive interviews on an alleged child victim of sexual abuse? A. Yes.

Q. And could you explain, sir, what special studies, testing and research you have done in that particular area? A. Well, in addition to our own research on repeated interrogations where we have looked at the videotapes and the children who have been repeatedly interrogated, we have reviewed—I have reviewed to the best of my knowledge all of the articles that deal—the research articles that deal in any way with the impact of the repeated interrogations, repeated questioning on children.

Q. What do these special studies show, Doctor? A. Two basic things. People who do interrogations seek to confirm their own hypothesis, their own idea as to what had occurred. So in our analysis reported in our latest book "The Real World of Child Interrogations", we find that in terms of the key statements of the children, so many that are in the nature of, "Yes, daddy touch my wee-wee," and so on.

. . . .

Q. Could you . . . tell us what the studies do show about the impact of successive interviews on children? A. I have said the first thing is the interrogator behavior, and the interrogators in the repeated interviews give information to children. Our study shows 35 percent of the time, the first time that the actual content of a question comes up when the adult questioner provides it, and at most a child will nod their head, maybe say yes, agree, but it is after repeated questions.

The second thing is when the interviews are repeated, the children learn. They learn the story. It tends to become a bit more elaborate as they learn what the adults basically want to hear, what they reinforce, what they respond to. And so the stories get more complex and rich under the impact. And children become subjectively certain that it is real.

4. Q. And have you also undertaken studies, research and testing about the use of anatomically correct dolls during the course of an interrogation. A. Yes.

Q. And would you please tell us what you have done in that area and what your studies and research has shown? A. We have conducted our own research program involving the attempt to find out if the dolls do what they are supposed to do: provide children an opportunity to show or demonstrate or give information about a prior event.

They don't. They are teaching devices. And a child who has no knowledge of sexual behavior, or very little, when the dolls are presented, can be taught about explicit sexual behavior, in addition to our own study on that which shows that interrogators can very quickly lead children to focus behavior with these dolls. In addition to that, we have reviewed all of the articles from all over the world that deal with the dolls. . . .

And there is no research evidence whatsoever to support the belief that a child can act with dolls to provide reliable information about a prior event. It simply isn't there. The research evidence in cognitive development specifically shows that children can't use dolls without adult instruction and guidance—young children up to age six.

And that's actually the only age group that they are supposed to be used with by the proponents of it. People who say, "Yes, these are good things. We should use them," don't use them with kids over six. They are not necessary.

But essentially, it sums up to this: Use of these dolls represents an intrusive and coercive behavior by adults to elicit from children actions that the adults use for their own purposes.

Q. Then, Doctor, could you tell me what the suggestive effect that the use of dolls and diagrams may have upon the purported child victim?

. . . .

5. See note 5 on page 638.

frained from giving his opinion as to N.'s truthfulness.

We do not address the issue of the admission of the videotape and the additional evidence from Underwager that the interviewing technique was suggestive, because we find Hulbert has failed to show the required prejudice. Lee explained her interviewing techniques. Underwager was able to testify to a number of reasons why the school program and the interviews with N. were suggestive. Additional challenges to the interview techniques would have been cumulative.

■ Hulbert next contends he should have been allowed to introduce Underwager's testimony on psychological profiles of sexual offenders. He contends it would have aided the jury in understanding the personality characteristics of known child molesters and why his personality did not fall in that category.

Underwager would have testified as to the psychological profiles of known child molesters and compared Hulbert's psychological profile with them. Underwager would have testified as to the social influences or pres-

sures exerted on children as a result of interviews following sexual abuse allegations.[6]

Underwager was prohibited from testifying about psychological profiles or social influences or pressures on children. This issue was raised by appellate counsel on appeal and dismissed by the supreme court. *See Hulbert*, 481 N.W.2d at 332–33. Underwager contends, however; if appellate counsel had included in her appellate brief the fact the trial court had allowed the State's witnesses to testify to the truthfulness and veracity of N., the supreme court would have found the trial court abused its discretion in the ruling. We disagree.

■ The next claim is, despite trial counsel's pointing it out, appellate counsel did not raise the issue of the trial court's refusal to allow Underwager to testify on social influences on N. No offer of proof was made of Underwager's testimony on this issue at the trial court level. Hulbert cannot show prejudice since he failed to make an offer of proof as to the substance of Underwager's testimony thereby permitting a determination of the effect that testimony would have had on his

Q. And what does it suggest then, these facts? A. I believe the facts that you have asked me to assume suggest that this child has been influenced by the behaviors of adults and that those behaviors have to be considered.

. . . .

Q. Doctor, assuming those are the facts that we pointed out, would there be any value after the June 2 interview—there is the initial report, initial interview, another interview on June 2— would there be any value of another interview and another interrogation of the child? A. Not of the sort that had been done up to this point, no.

Q. And why is that? A. This kind of procedure would simply reinforce the behavior and would not get any additional information about reality.

5. Underwager said:

A. Reviewing all of the research literature on the use of drawings on assessment and evaluation of children, 40, 50 years of effort shows that there is no validity and there is no reliability to the use of drawings. The use of these kinds of drawings again is a very clear message to the child: the adult is interested in sexuality. I mean it is not normal that an adult presents a child with a picture of a nude person with genita-

lia clearly represented. That doesn't happen too often, and it is a pretty powerful message.

There is no evidence that the use of these drawings has anything to do with a valid or reliable assessment.

These particular drawings come from a book called Red Flag, Green Flag, and that's a program text. You have 14 tries. The child who goes through those 14 tries learns that this is, "Boom. This is what I circle, this is what I draw."

So there is no evidence to support the use of these drawings whatsoever.

Q. Does the time during which an interrogation is taking place when such diagrams are produced—is that significant at all, Doctor? A. Yes, I believe so.

Q. And in what way is that significant? A. I think the earlier an investigation focused upon sexuality and sexual events, these kinds of drawings are introduced, the more impact they will have to focus a child on "This is what this whole thing is about."

6. The offer of proof involved Underwager's analyzing test given Hulbert and, ultimately, concluding:

A. In the evaluation, the test results of Mr. Hulbert, we do not find anything that would suggest he is comparable to or like or produced a similar kind of test result that known child molesters do.

case. *State v. Johnson*, 312 N.W.2d 144, 147 (Iowa App.1981). Hulbert has failed to show prejudice on this issue.

■ Hulbert next contends appellate counsel, though raising the issue of refusal to give the spoliation instruction on the loss of the videotape, did not raise all valid arguments. The issue was raised on appeal. *Hulbert*, 481 N.W.2d at 334. Hulbert contends appellate counsel failed to raise due process and fair trial arguments. The court specifically addressed the due process issue. *Id.* Hulbert cites no authority to show a fair trial argument is different or would have rendered a different result.

■ Hulbert next contends appellate counsel should have challenged the trial court's refusal to grant a mistrial on destruction of evidence. The audio tape was the first recording made of an interview with N. It was made in the sheriff's office and kept in the sheriff's possession. Parts of the audio tape were erased as the result of two errors. See the discussion in *Hulbert*, 481 N.W.2d at 334–35. The two erasures were not the only problem. Hulbert was told the audio tape was totally erased before trial. Then, during the trial, the audio tape turned up with the last five minutes not erased. A State's witness claimed he cleaned his tape player and found the last minutes. Hulbert immediately asked for a mistrial. Hulbert claimed the audio tape was crucial to his case because it was the first recorded statement N. made after the allegations against Hulbert. Hulbert contends, if they had known the audio tape was available, Underwager could have used it to critique Branstad's interview techniques and N.'s story as it developed through successive interviews. Furthermore, Hulbert alleged some of N.'s statements recorded on the audio tape were not consistent with the testimony she gave at trial. He argues the audio tape was said to have been destroyed on three separate occasions by the department that had custody of the audio tape, but prior to the third erasure of the tape, the sheriff and county attorney knew a portion of the audio tape remained and the tape was admitted into evidence without first disclosing its existence to Hulbert. Hulbert's trial attorney contends if he had

known a portion of the audio tape was available, he would have changed his trial strategy. He said he would have asked Branstad questions and her testimony could have been impeached by the audio tape.

The supreme court specifically found the two audio tape erasures were negligent and not intentional, *Hulbert*, 481 N.W.2d at 334, and were made when the State was attempting to help, not hinder, the defense. From the court's opinion in *Hulbert*, it is not possible to discern whether it was aware of the third supposed erasure and the surprise appearance of the audio tape at trial and whether these facts might have cast the issue in a different light. The fact the first two erasures were negligent, not intentional, has been decided. The only issue is whether, if appellate counsel had raised the issue of the mistrial, there would have been a different result. A trial court is given considerable discretion on the issue of a mistrial. The trial court was aware of the erasures, as well as the surprise appearance of the audio tape after it was said to have been destroyed, and refused to grant a mistrial. *Hulbert*, 481 N.W.2d at 334–35. The trial court did not abuse its discretion in not granting a mistrial. We deny postconviction relief on this ground.

■ The next issue raised by Hulbert is appellate counsel was not effective because she did not raise as an issue the trial court's refusal to include "on or about" dates in the marshaling instructions for the two counts of second-degree sexual abuse. We have considered this argument and the authorities cited as well as all other arguments raised and find no basis for reversal.

**AFFIRMED.**